UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————————— x

HITOUCH BUSINESS SERVICES CO. and          :
MYOFFICEPRODUCTS, INC.,                     :
                                            :
                    Plaintiffs,             :          16 Civ. ____ (  )
                                            :
                                            :          **COMPLAINT**
                  - against -               :
                                            :          Jury Trial Demanded
SUZANO PAPEL E CELULOSE S/A,                :
SUZANO PULP AND PAPER AMERICA, INC. and     :
MIDLAND PAPER CO. (d/b/a MIDLAND PAPER      :
PACKAGING + SUPPLIES),                      :
                                            :
                    Defendants.             :

——————————————————————————— x

Plaintiffs HiTouch Business Services Co. ("HiTouch") and MyOfficeProducts ("MyOP" and collectively with HiTouch, "Plaintiffs") by and through their attorneys, Kramer Levin Naftalis & Frankel LLP, hereby allege for their complaint as follows.

## Nature of the Action

1.      This is an action for unfair competition and breach of contract. As set forth below, all defendants have repeatedly supplied Plaintiffs with non-merchantable paper, in violation of the parties' agreement. Such breaches persisted despite Plaintiffs' repeated complaints and demands, causing injury to Plaintiffs through lost business, transaction costs of replacing defective paper, and harm to Plaintiff's reputation and goodwill. Defendants Suzano Papel E Celulose S/A ("Suzano S/A") and Suzano Pulp and Paper America, Inc. ("Suzano Inc." and collectively with Suzano S/A, "Suzano") also violated their agreement with Plaintiffs not to re-sell rejected paper in the United States, by unauthorizedly dumping such rejected, defective paper, bearing MyOP's trademarks, trade names, and trade dress, into the U.S. market. Suzano's conduct further constitutes unfair competition and false designation of origin, as Suzano's

actions will likely deceive the public into believing that the defective paper is associated with or endorsed by Plaintiffs – which is not the case – causing further injury to Plaintiffs' reputation and goodwill.

### The Parties

2.      Plaintiff HiTouch is a leading provider of business products and services. Through its nine constituent brands – including *MyOfficeProducts* – HiTouch offers a single source for virtually everything a business needs to operate, including office supplies, equipment, and furniture, with annual revenues of approximately $300 million.  HiTouch is a New Jersey limited liability company.

3.      HiTouch sells office supplies through its wholly owned subsidiary, MyOP. MyOP is the second largest privately held office supply company in the United States.  MyOP is a Georgia corporation with its principal place of business in Tennessee.

4.      Defendant Suzano S/A is one of the largest manufacturers of Eucalyptus pulp and cut paper in the world.  Upon information and belief, Suzano S/A posted more than $2.6 billion in revenues in 2014 and had a net worth approaching $4 billion.  Suzano S/A is a publicly traded Brazil corporation with its principal place of business in Brazil.

5.      Suzano S/A does business in the United States through its wholly owned American subsidiary, defendant Suzano Inc.  Upon information and belief, Suzano Inc. is a Delaware corporation with its principal place of business in Florida.

6.      According to its website, defendant Midland Paper Co. ("Midland," and together with Suzano, "Defendants") is one of the largest independently owned paper and packaging distribution firms in the United States; it has been named one of Chicago's Top 50 Private Companies and upon information and belief has annual revenues in excess of $1 billion.

KL3 3084077.1

Midland is Plaintiffs' wholesaler-importer in connection with Plaintiffs' dealings with Suzano. Upon information and belief, Midland is an Illinois corporation with its principal place of business in Illinois.

<u>**Jurisdiction and Venue**</u>

7.      This Court has federal question subject-matter jurisdiction under 28 U.S.C. § 1331, as this action arises under Section 43(a) of the federal Lanham Act.  This Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367(b).

8.      Defendant Suzano is subject to personal jurisdiction in this District because the disputed transactions from which this action arises occurred largely in Manhattan. Among other things, Suzano knowingly and willfully breached its written agreement with HiTouch not to sell defective paper in the United States by selling to a New York-area jobber who sold the paper in Manhattan.  Suzano is independently subject to personal jurisdiction in this District because it has consented to jurisdiction in any United States court for disputes arising out of its written agreement with HiTouch's wholesaler-importer Midland.  HiTouch and MyOP are third-party beneficiaries of this agreement.

9.      Defendant Midland is subject to personal jurisdiction in this District because it regularly transacts business here through its New York office, located at 5 Penn Plaza, New York, NY.

10.      Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred here.

KL3 3084077.1

**Background: HiTouch Acquires MyOfficeProducts and Begins Selling Suzano Paper**

11.     MyOP was founded in 2002.  Between 2002 and 2010, the company grew from a regional startup with approximately $10 million in annual sales to a national player whose annual sales now exceed $120 million.  Together with toner (ink), sales of printer and copy paper are the biggest driver of MyOP's sales revenue.

12.     In or about early 2009, MyOP acquired a Midwestern distributor called Royal Office Products, which sold paper manufactured by Suzano.  The relationship between MyOP and Suzano began with this acquisition.

13.     MyOP thereafter expanded its relationship with Suzano.  In early 2009, MyOP began advertising and selling a private label copy paper manufactured by Suzano (the "Private Label Paper").

14.     The Private Label Paper was sold in a distinctive bright gold wrapper, which prominently bore the gold and black *MyOfficeProducts* trademark and logo shown below:



15.     Until just last week, the name *MyOfficeProducts*, the distinctive *MyOfficeProducts* trademark, and the unique gold, white, and black trade dress in which the Private Label Paper is packaged had been used exclusively and continuously, widely throughout the United States, in connection with the advertising and sale of copy paper from a single source: MyOP.

16.     HiTouch acquired MyOP in November 2010.  Upon the closing of that acquisition, and continuously since that time, HiTouch, through MyOP, continued to sell the Private Label Paper.  HiTouch (through MyOP) also purchased from Suzano, and sold to authorized retailers, paper in Suzano's wrapper, which bore Suzano's trademark *Report* (the

"Report Copy Paper," and together with the Private Label Paper, collectively, the "Suzano Paper").

### HiTouch's Agreements with Suzano and Midland

17.    For years, HiTouch purchased the Suzano Paper from Suzano through Plaintiffs' wholesaler-intermediary Midland, while interacting directly with Suzano in negotiating and performing other aspects of each transaction.  In so doing, Suzano, Midland, and Plaintiffs established the following course of conduct.

18.    Each year, Midland entered into a written agreement (each, an "Annual Agreement") with Suzano to sell paper to MyOP and HiTouch for distribution by those entities. Through Midland, Plaintiffs shared with Suzano Plaintiffs' projected sales for the coming year, and executed purchase orders against these goals throughout the year.

19.    Each Annual Agreement contained quarterly volume targets whose achievement triggered rebates issued by Suzano to Plaintiffs.  The Annual Agreements memorialized the quarterly volume goals for the year, expressed in metric tons.  Each year, Plaintiffs negotiated the quarterly volume goals for the coming year directly with representatives of both Suzano and Midland.  Historically, negotiations were conducted by and among Butch Johnson of HiTouch, Thomas Tarpey or Clive Gillanders of Suzano, and Daniel Bernhart of Midland.

20.    HiTouch and MyOP were third-party beneficiaries of the Annual Agreements between Midland and Suzano, as is immediately apparent from the face of such agreements.  For example, Section 2 of the most recent Annual Agreement provides that the "product object" of the Agreement" is:

KL3 3084077.1

**Cutsize Paper:** cartons on pallets
— MYOP Private Label
— Report Copy Paper

Section 4.1 of the most recent Annual Agreement provides that "Suzano will pay $2.00 cwt (US$ 44.00 / MT) fidelity rebate on all purchases of Report and Myoffice private label shipped to Myoffice, SP Richards, Essendant, Hi Touch, or other direct My office end user customers." Section 4.2 provides that "Suzano Pulp and Paper will pay Midland Paper (who in turn will pay Myoffice) quarterly." The contract also specifies the "quarterly volume rebate goal[s]" for each quarter. Other than the specific yearly sales targets, which were revised annually, the material terms of the Annual Agreements were substantially identical from year to year.

21.     For approximately five years, the Suzano Paper received by Plaintiffs was of satisfactory and merchantable quality.

### Smelly Paper: Suzano's Quality Plummets

22.     In late 2015, however, Suzano's quality nosedived, and Plaintiffs began receiving complaints from customers reporting that the Suzano Paper gave off a strong musty odor similar to mildew or mold. At first, these complaints appeared limited to certain lines of Suzano Paper sold in only one or two regions of the United States. But by early 2016, Plaintiffs became inundated with complaints from across the country about several lines of Suzano Paper. Even more troubling, the odor complaints occurred most often with MyOP's distinctive Private Label Paper, eroding the strong association between fine-quality paper and the *MyOfficeProducts* trademarks, trade dress, and trade name that Plaintiffs had worked for years to establish.

23.     Plaintiffs immediately informed Suzano and Midland of the complaints. In response, Suzano representatives asked Plaintiffs to collect cartons of the rejected Suzano Paper and to ship them back to Suzano for inspection and testing. For the first six weeks of

KL3 3084077.1

2016, Suzano "apologize[d] for the inconvenience" to Plaintiffs, but offered no answers, claiming it was "still waiting for lab results."

24.     By late January, Plaintiffs began to urge Midland to "step in," to convey Plaintiffs' displeasure to Suzano, and to work with Suzano to get the smelly paper problem under control.   On February 3, for example, MyOP's Executive Vice President of Merchandising, Butch Johnson, sent an email to Daniel Bernhart of Midland discussing "more reports today of 'Smelly Paper.'"   "Customer bad will" was "being created everywhere," Johnson continued; Suzano's Quality Assurance would need to "step up right now" and impose an immediate quarantine on defective paper.

25.     By February 18, Suzano claimed to have identified the mills and paper machines responsible for the defective, non-conforming product, and to have quarantined such product by Mill Number.   According to Suzano, test results of the Suzano Paper were ultimately inconclusive, but Suzano surmised that the odor could have been caused by microbes growing in the machines of its supplier mills.   Suzano told Plaintiffs that biocide dosages were eventually increased in its producers' mills, and that the problem had been solved.   In a February 18 email to Midland on which HiTouch and MyOP personnel were copied, a Technical Customer Service Manager wrote that paper milled by Suzano in December and January was "confirmed to be without odor."   According to Suzano, "Corrective actions have been implemented and product without odor is in the supply chain."   Suzano reported that it had nevertheless "expanded the quarantine to include 8 additional batches from July and August production in addition to the original list."   And Suzano promised to "spot check all batches in our inventory before sending to [Plaintiffs] to make sure no product with odor is shipped."   The same day, Daniel Bernhart of

Midland sent an email to Plaintiffs copying Suzano, stating "the solution to manufacture paper without the odor has become a hard spec and will prevent the issue to occur again."

26.     Despite these assurances, it soon became clear that Suzano was in fact unwilling or unable to remedy the deficiencies in its process that caused it to produce defective paper.  Suzano, through Midland, continued shipping paper by the truckload from batches Suzano itself had identified as defective.  In mid-February 2016, for example, Plaintiffs flagged paper from Mill Number 5010908 for quarantine.  The following month, Suzano shipped 5,040 cartons – i.e., six truckloads – of paper from Mill Number 5010908 to Plaintiffs.  Similarly, on April 6, Plaintiffs informed Suzano that Mill Number 5013756 contained several cartons of defective Suzano Paper, something Suzano itself did not appear to have known, as it had not yet placed paper from that Mill Number in its quarantine.  Nearly two months later, Suzano Paper from the same Mill Number – which by then supposedly had been quarantined – was delivered to Plaintiffs' warehouse in Greensboro, North Carolina.  When confronted with this evidence, a Suzano representative admitted that paper from this batch "should not have shipped."  Suzano likewise failed to detect contamination in Mill Numbers 5013757, 5011446, and 5011438, and to quarantine that product.

27.     Meanwhile, throughout the first half of 2016, Plaintiffs received steadily increasing complaints about defective Suzano Paper being delivered to customers under the *MyOfficeProducts* brand, including complaints that gave rise to potential health and safety concerns.  For instance:

- A hospital in New Jersey required Plaintiffs to replace the Suzano Paper after receiving complaints that "people in the office" were "getting sick" from "moldy paper"; and

- A law firm in Tennessee asked Plaintiffs to "pull" and "replace[]" all of its paper after receiving complaints about the Suzano Paper.  The firm told

8

Plaintiffs it was "concern[ed] about exposing [its] employees to mildew" after an employee who is "allergic to mold" had a reaction to the Suzano Paper.

28.     Plaintiffs soon found themselves facing inventory shortages as they scrambled to effectively respond to their customers' outrage and save their deteriorating reputation.  As a result, Plaintiffs were forced to incur tens of thousands of dollars in labor and trucking fees to collect and replace ever-larger duplicative quantities of defective Suzano Paper, and to shuffle merchantable inventory among warehouses to make up for supply shortfalls.

29.     Despite Plaintiffs' best efforts to address the growing dissatisfaction with what was understood by customers to be *MyOfficeProducts* paper (but was in fact paper originating from Suzano), Plaintiffs soon began losing their customers and hemorrhaging goodwill.  To take but a few examples:

- A large law firm with thirteen offices in the United States terminated its relationship with MyOP and hired another supplier instead, citing the defective Suzano Paper as the reason for the switch.  The firm had purchased hundreds of thousands of dollars worth of paper per year as a MyOP customer.

- A North Carolina hospital that generated several millions of dollars in business each year for MyOP signaled an interest in moving to another supplier, but agreed to remain with MyOP after MyOP's president John Frisk met with hospital representatives and fought to retain the business. Just days later, MyOP was flooded with complaints that medical personnel at the hospital were experiencing "sinus and respirator[y] issues" as a result of the "moldy smelling" Private Label Paper.  "Can we please get the reams we have picked up because the smell is lingering[?]," one hospital administrator pleaded.  "I could not believe we were being sent such stuff," said another.

- In early April, a Nevada law firm refused a replacement delivery of Suzano Paper that gave off the same odor as the paper it was sent to replace.  Having already given MyOP and Private Label Paper several tries, the firm decided to "order [its] old paper" instead.

- A California bank reported a "smell problem" affecting several cases of Private Label Paper and demanded "replacement of these cases ASAP."

9

When MyOP replaced the paper, every case of the replacement paper was equally "bad."

- A children's hospital in California complained that the paper it was sent to replace the malodorous Suzano Paper "smelled worse, frankly." Like the North Carolina hospital, the California hospital voiced "concern[s]" that the "mold/mildew" contaminant could create "air[borne] health issue[s] especially when the paper runs through our copy machines when the machine is warm/hot." "Can we fix this problem?" the hospital asked. "Or better yet, please send us paper that is not this brand?"

30. Suzano responded to the growing chorus of complaints with incompetence and denial. In April, for example, a Suzano manager collected paper samples from lot number 5014177. After inspecting the samples, he informed Butch Johnson, HiTouch's Executive Vice President for Merchandising, that there was "no issue" with paper from this lot. Less than two months later, when paper from the same lot was delivered to a major District of Columbia-area hospital – an important new client for Plaintiffs whose paper purchases exceeded $40,000 per month – the hospital's Inventory Operation Supervisor complained that the paper had "an awful mildew smell to it."

31. Suzano continued to respond to Plaintiffs' mounting concerns by repeatedly asserting, in a series of emails and conference calls with Plaintiffs, that Suzano had resolved its quality issues. However, Suzano also implicitly acknowledged the ongoing problem by continuing to request that Plaintiffs remit samples of defective Suzano Paper for testing – together with the Mill Numbers associated with such paper – so that Suzano could expand the quarantine as necessary.

**Suzano Sells Rejected Private Label Paper**

32. In February 2016, Suzano agreed in writing to deem the rejected, defective Private Label Paper "not sellable," to export it from the United States, and to issue certain credits to Plaintiffs (the "Export Agreement"). In exchange, Suzano requested permission to sell the

defective paper "into markets outside of N[orth] A[merica] (i.e. Haiti or other Caribbean countries)." Plaintiffs responded by "grant[ing] the option of selling into the markets noted."

33.     Thereafter, Plaintiffs learned that Suzano had begun "dumping" defective Private Label Paper in the United States – still in *MyOfficeProducts* packaging – at below-market prices.  In particular, Plaintiffs learned that Suzano sold several truckloads of defective Private Label Paper to a jobber in the New York metropolitan area, which paper was then sold to various retail outlets in Manhattan.  This jobber soon began receiving complaints about the paper's strong musty odor.

34.     Unauthorized (and therefore likely defective) Private Label Paper has also appeared on the website eBay, where it was being offered for sale in the United States as of at least June 22.[1]  In the field labeled "Shipping," the website stated:  "Item location:  Wichita, Kansas, United States."  Directly below that appeared the words:  "Ships to:  United States," as shown below:

---

[1] Although the paper has apparently since been sold, the eBay webpage associated with the unauthorized sale of that paper is still online, and can be viewed at the following Internet address:  http://www.ebay.com/itm/Copy-Paper-Multipurpose-8-1-2x11-White-100-ISO-99-GE-Carton-Of-10-Reams-/191903202308?hash= item2cae527c04:g:gLIAAOSwepJXalhp.



35.     Under "Seller information" appears the name "arraystore."  According to eBay, "arraystore" is an online jobber based in Thailand that appears to sell everything from office supplies to baby products.

36.     Upon information and belief, Suzano sold the defective Private Label Paper to arraystore, delivering it to a United States location in or around Topeka, Kansas.  Upon information and belief, Suzano was fully aware at the time of such delivery that arraystore purchased the defective paper with the intent to re-sell it in the United States.  Despite this knowledge, and in violation of the Export Agreement, Suzano did not restrict itself from re-selling defective Suzano Paper in the United States, and placed no such restriction on any party to whom Suzano offloaded such product.

**HiTouch Terminates its Relationship with Defendants**

37.     On June 7, 2016, HiTouch sent Suzano a letter demanding that Suzano immediately terminate the unauthorized sales of defective Private Label Paper and that Suzano

confirm its compliance in writing within twenty-four hours.  To date, Suzano has not replied to that letter.  A copy of such letter is attached hereto as Exhibit A.

38.     On June 9, having afforded Suzano approximately six months to cure the gross and pervasive defects of the Suzano Paper – and after Suzano failed to respond to the June 7 letter – HiTouch sent Suzano and Midland a letter terminating Plaintiffs' contractual relationship with Suzano (both directly and through Midland), cancelling any outstanding purchase orders, and requiring Suzano to pick up any Suzano Paper remaining in Plaintiffs' inventory.  Defendants failed to respond to this letter as well.  A copy of such letter is attached hereto as Exhibit B.

## The Impact of Defendants' Breaches

39.     Defendants' contractual breaches and Lanham Act violations significantly injured Plaintiffs in several different ways.

40.     First, Plaintiffs incurred direct transactional and administrative costs associated with recalling and quarantining the defective Suzano Paper, for which Midland also was responsible under the terms of the parties' contract.  Defendants' breaches forced Plaintiffs to incur additional labor costs to track and quarantine Suzano Paper from a growing list of Mill Numbers that Suzano itself had failed to identify as defective, or worse, that Suzano had identified as defective but shipped paper to Plaintiffs from anyway.  Additionally, with merchantable inventory in short supply, Plaintiffs were forced to incur the costs of trucking new inventory across the country in an attempt to avoid supply outages.

41.     Second, Plaintiffs incurred costs of purchasing substitute goods.  To meet their customers' orders, and to replace the truckloads of defective inventory with which they were now saddled, Plaintiffs located a domestic manufacturer capable of filling Plaintiffs' orders

KL3 3084077.1

on an emergency basis.   While Plaintiffs contemplate that this domestic manufacturer will eventually produce a signature line of paper to be sold in HiTouch packaging bearing the distinctive *HiTouch* trademark, trade dress, and trade name, the manufacturer could not initially fill Plaintiffs' purchase orders with such paper.   As a stopgap measure, Plaintiffs sold another company's paper until they could sell their own, which got product on the shelves but caused Plaintiffs to suffer several commercial disadvantages: (1) Exposing customers to a succession of papers and cartons – first, the Private Label Paper, then the domestic manufacturer's brand of paper, and finally, the new HiTouch paper – undercut Plaintiffs' goal of building a unique and identifiable brand; (2) the cost of cover was not cheap:  the domestic manufacturer charged $0.65 more per carton than Plaintiffs had paid under their agreement with Suzano, reducing Plaintiffs' margin on all replacement paper; and (3) Plaintiffs forfeited their entire margin on paper sales lost due to manufacturing defects.

42.   Third, Suzano's actions have inflicted ongoing damage to Plaintiffs' sales as customers continue to abandon Plaintiffs for other suppliers.   After steadily climbing for years, Plaintiffs' paper sales dropped precipitously in February 2016 as a result of the defective Suzano Paper and have not recovered.   More specifically, throughout 2015, Plaintiffs sold an average of approximately 59,575 cartons of paper every month.   By February 2016, however, Plaintiffs' monthly paper sales had fallen to 44,704 cartons – a decline of 16.5% from the previous month and 25% from Plaintiffs' average monthly sales for the previous year.   This trend continued: In March 2016, Plaintiffs sold 16,358 fewer cartons of paper than they had sold the previous March, and in April 2016, Plaintiffs sold nearly 18,000 fewer cartons of paper than they had sold the previous April.

KL3 3084077.1

43.     Fourth, to the extent Plaintiffs have succeeded in retaining customers and sales, Plaintiffs' margin on sales of the new HiTouch paper will be slimmer than the margin on sales of the Private Label paper had been, since the new paper costs Plaintiffs an additional $0.65 per carton.

44.     Finally, faced with the loss of customers, declining sales, and squandered goodwill resulting from Suzano's quality issues and unauthorized dumping, Plaintiffs came to a difficult realization:  they could no longer sell paper under the *MyOfficeProducts* brand, which had been damaged beyond repair as a result of Defendants' actions.  Thus, after investing heavily to develop a broad, nationwide market for *MyOfficeProducts* paper (sold under MyOP's distinctive trademark, trade name, and trade dress), and after selling hundreds of thousands of metric tons of paper under the *MyOfficeProducts* brand for six years straight, Plaintiffs abandoned use of the *MyOfficeProducts* trademarks, trade dress and trade name in connection with the sale and advertising of paper.

**FIRST CAUSE OF ACTION (AGAINST SUZANO)**
**UNFAIR COMPETITION & FALSE DESIGNATION OF ORIGIN IN VIOLATION OF**
**SECTION 43(A) OF THE LANHAM ACT**

45.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 444 above.

46.     Suzano's unauthorized sale of defective Private Label Paper in the United States is outside the scope – and, indeed, expressly violates – the Export Agreement and is otherwise unauthorized by Plaintiffs.

47.     Any continued sales by Suzano of defective Private Label Paper, and any other use of Plaintiffs' trademarks, trade names, and trade dress, would further be without Plaintiffs' authorization.

48.    Such unauthorized use of Plaintiffs' trademarks, trade name, and trade dress will likely cause the public to be deceived and confused and to incorrectly believe that Plaintiffs are associated with Suzano or its products, all to the detriment and to the irreparable damage of Plaintiffs' reputation and goodwill.

49.    Suzano's continuing unauthorized sales of the defective Private Label Paper – and any other use by Suzano of Plaintiffs' trademarks, trade name, and trade dress – without permission from Plaintiffs constitutes false designation of origin and federal unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  Suzano's unfair competition has been intentional and willful, constituting an exceptional case pursuant to Section 24 of the Lanham Act, 15 U.S.C. § 1117.

50.    By reason of the foregoing acts of Suzano, Plaintiffs have sustained – and, unless Suzano is enjoined, will continue to sustain – substantial injury and damage and suffer irreparable harm for which Plaintiffs have no adequate remedy at law.  Suzano unlawfully and wrongfully derived, and will derive, income and profits and has been and will be unjustly enriched as a result of the foregoing acts.

### SECOND CAUSE OF ACTION (AGAINST SUZANO)
### TRADEMARK INFRINGEMENT (NEW YORK COMMON LAW)

51.    Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 50 above as though fully set forth herein.

52.    Further unauthorized use of Plaintiffs' trademarks, trade names, and trade dress is likely to cause confusion, mistake, and deception, and constitutes trademark infringement under the common law of the State of New York.

53.    By reason of the foregoing acts of Suzano, Plaintiffs have sustained – and, unless Suzano is enjoined, will continue to sustain – substantial injury and damage and will

16

suffer irreparable harm for which Plaintiffs have no adequate remedy at law.  Suzano unlawfully and wrongfully derived, and will derive, income and profits and has been unjustly enriched as a result of the foregoing acts.

### THIRD CAUSE OF ACTION (AGAINST SUZANO)
### UNFAIR COMPETITION (NEW YORK COMMON LAW)

54.     Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1 through 53 above as though fully set forth herein.

55.     By its aforementioned conduct calculated in bad faith to deceive and confuse the public, Suzano's unauthorized sales of the defective Private Label Paper constitutes unfair competition including unlawful, unfair, and fraudulent business practices in violation of the common law of the State of New York.

56.     By reason of the foregoing acts of Suzano, Plaintiffs have sustained – and, unless Suzano is enjoined, will continue to sustain – substantial injury and damage and will suffer irreparable harm for which Plaintiffs have no adequate remedy at law.  Suzano unlawfully and wrongfully derived, and will derive, income and profits, and has been and will be unjustly enriched as a result of the foregoing acts.

### FOURTH CAUSE OF ACTION (AGAINST ALL DEFENDANTS)
### BREACH OF CONTRACT

57.     Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1 through 566 above as though fully set forth herein.

58.     In negotiating quarterly volume goals with Plaintiffs and filling purchase orders toward those goals, Defendants entered into a binding contract to supply paper of merchantable quality to Plaintiffs.

59.     In the alternative, Plaintiffs were third-party beneficiaries of the Annual Agreements between Midland and Suzano.

60.     Separately, Suzano entered into a direct and binding agreement with Plaintiffs not to sell defective Private Label Paper into the United States, to wit:  the Export Agreement.

61.     By delivering paper that was not fit for the purpose for which it was intended – or indeed, for any purpose – Suzano and Midland breached their agreement to provide Plaintiffs with paper of merchantable quality.

62.     By knowingly selling defective Private Label Paper to jobbers in the United States and abroad who planned to sell, and did sell, such paper in the United States, Suzano also breached the Export Agreement, under which it promised not to sell the defective Private Label Paper anywhere in North America.

63.     By reason of the foregoing, Defendants are indebted to Plaintiffs in an amount to be determined at trial.

### FIFTH CAUSE OF ACTION (AGAINST ALL DEFENDANTS)
### UNJUST ENRICHMENT

64.     Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1 through 63 above, as if fully set forth herein.

65.     As a result of the conduct described above, Suzano has been unjustly enriched at the expense of Plaintiffs.  Specifically, Suzano has been unjustly enriched by its improper and unauthorized sales of defective Private Label Paper in the United States.

66.     To the extent that Midland has improperly retained payment from Plaintiffs for shipments of defective paper without issuing refunds or other credits therefor, it too has been unjustly enriched.

KL3 3084077.1

67.     Plaintiffs are entitled to be compensated for Defendants' unjust enrichment at Plaintiffs' expense by an amount to be proven at trial.

68.     Wherefore, Plaintiffs demand judgment as follows:

(i)     compensatory damages against all defendants in an amount to be determined at trial;

(ii)    punitive damages for Suzano's willful and bad faith conduct in an amount to be determined at trial;

(iii)   a permanent injunction enjoining Suzano from:

a.  violating the Export Agreement by selling the defective Private Label Paper in North America and/or by permitting, acquiescing in, or failing to take steps to prevent such sales by third parties;

b.  engaging in any other act likely to cause the mistaken belief that Suzano and/or the paper it sells or offers to sell is in any way endorsed or sponsored by, or otherwise affiliated, connected, or associated with Plaintiffs;

c.  otherwise competing unfairly with Plaintiffs in any manner.

(iv)    disgorgement of Suzano's ill-gotten gains resulting from Suzano's unauthorized and improper sales of defective Private Label Paper and any other amounts by which Defendants are determined to have been unjustly enriched;

(ii)    costs, including attorneys' fees, associated with Plaintiffs' enforcement of their rights under the Annual Agreements and the

KL3 3084077.1

Export Agreement, including without limitation the costs and attorneys' fees Plaintiffs have incurred in connection with this action; and

(iii)    such other and further relief as the Court deems just and proper.

**<u>Plaintiffs Demand a Trial by Jury</u>**

Dated: New York, New York
July 1, 2016

Kramer Levin Naftalis & Frankel LLP

By:    /s/Jeffrey S. Trachtman
       Jeffrey S. Trachtman

1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100
jtrachtman@kramerlevin.com

Attorneys for Plaintiffs HiTouch Business Services Co.
and MyOfficeProducts, Inc.

20